# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1977

DRAEGER OIL COMPANY, INC., *et al.*,

*Plaintiffs-Appellants,*

v.

UNO-VEN COMPANY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99-CV-317—**Charles N. Clevert**, *Judge.*

ARGUED SEPTEMBER 13, 2002—DECIDED DECEMBER 26, 2002

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* The Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.*, is a federal statute for the protection of franchised dealers and distributors of gasoline and other petroleum projects. The ostensible theory of such statutes (ostensible because it is unclear why the intended beneficiaries could not obtain similar protection by contractual negotiation) is that a franchised dealer in effect invests in the franchisor's trademarks and as a result creates goodwill for the franchisor which the latter might on occasion be tempted to appropriate by terminating the franchisee. *Brach v. Amoco Oil Co.*, 677 F.2d

1213, 1220 (7th Cir. 1982); cf. *Praefke Auto Electric & Battery Co. v. Tecumseh Products Co.*, 255 F.3d 460, 464-65 (7th Cir. 2001); *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1097 (7th Cir. 1988). To prevent such opportunistic behavior the Act limits the franchisor's right to terminate its franchisees. Limits, but of course does not prohibit altogether. The Act authorizes termination of a franchise on a variety of grounds, of which the one pertinent to this case is "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable." 15 U.S.C. § 2802(b)(2)(C). This suit by a class of gasoline dealers complains about the cancellation of their franchise to sell gasoline under the trademarked brand names "Union 76," "Union," "76," and "Unocal" by the defendants, primarily Union Oil Company of California, popularly known as Unocal. The district court granted summary judgment in favor of the defendants.

The facts dispositive of the appeal are simple and we'll simplify them even further, for example by pretending that "Union 76" is the only brand name in issue and by ignoring some of the corporate layers involved in the transactions. In 1989 Unocal formed a 50-50 partnership called Uno-Ven with Petroleos de Venezuela (PDV), a large producer of crude. The purpose of the partnership was to refine the crude oil into gasoline and sell it to dealers in the midwest. PDV would supply the crude and Unocal the refining and marketing assets. Unocal had a refinery in Illinois and had franchised a number of midwestern dealers. As part of the partnership agreement, Unocal licensed Uno-Ven to use the Union 76 trademark. Uno-Ven in turn licensed the trademark to Unocal's former dealers.

Eventually the partners, Unocal and PDV, had a falling out, both because the terms of the partnership turned out

to be highly disadvantageous to PDV and because Unocal decided to get out of the refining and marketing end of the oil business and instead concentrate on exploration and development. In partial implementation of this decision Unocal in 1996 sold all its refining and marketing assets in the western United States to Tosco Oil Company, together with the trademarks under which Unocal had marketed gasoline, such as Union 76. The sale was subject to Unocal's existing trademark licenses, including the one it had issued to Uno-Ven for reissuance as it were to the dealers.

The following year, Unocal and PDV dissolved Uno-Ven. Under the terms of the dissolution, Uno-Ven was to return Union 76 and the other trademarks to Unocal. Since Uno-Ven was going out of business, it notified the dealers that their franchises were terminated, the termination to take effect a year after the notice. PDV, which as its share of Uno-Ven's property upon dissolution got Unocal's midwestern refining and marketing assets, including the Illinois refinery, agreed to support the trademark during the one-year grace period. This was essential because for a trademark to remain enforceable (that is, to avoid, as the cases say, "abandonment"—though "forfeiture" would be more accurate), the owner must, through monitoring, testing, and other means, maintain the quality and uniformity of the trademarked product, *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885-86 (7th Cir. 1997); *AmCan Enterprises, Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994); *Barcamerica International USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-98 (9th Cir. 2002); *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33, 35 (2d Cir. 1962), "so that consumers are not deceived by the identity of names into buying a product different from what they reasonably expected." *AmCan Enterprises, Inc.*

*v. Renzi, supra,* 32 F.3d at 235. The economic function of a trademark is to provide the consuming public with a concise and unequivocal signal of the trademarked product's source and character, *Ty Inc. v. Perryman,* 306 F.3d 509, 510 (7th Cir. 2002), and that function is thwarted if the quality and uniformity of the trademarked product are allowed to vary significantly without notice to the consumer.

Unocal wanted to be out of the marketing business altogether, and so it had no interest in licensing the dealers when the year expired, as that would have required Unocal to take over the support function. So when the year was up the dealers were no longer able to sell gasoline under the Union 76 trademark and they had either to find another oil company willing to license its trademark to them (as many in fact did), or to sell their own brand or go out of business. They do not question the legitimacy of the dissolution of Uno-Ven; and it is hardly to be expected that Unocal would want to support a retail trademark, necessarily at some cost, after it had left the retail business. But they argue that it was unreasonable for Unocal as part of the dissolution of Uno-Ven to effectuate the termination of their franchises rather than, for example, to transfer the Union 76 trademark to PDV for the latter to license to the dealers.

Unocal points out that not it but Uno-Ven was the franchisor and clearly it was reasonable for Uno-Ven, which was dissolving, to terminate the franchises. Although some of these had been Unocal franchises before they were Uno-Ven franchises, and Unocal could doubtless have recaptured the trademarks in the dissolution of Uno-Ven (PDV had no interest in them), it could not have reissued franchises to the dealers, even if it had wanted to remain in the marketing business, because of its deal with Tosco.

For remember that while its sale of the Union 76 trademark to Tosco had been subject to Unocal's existing franchises, it did not entitle Unocal to issue new franchises.

The plaintiffs counter by arguing that Unocal, too, along with Uno-Ven, was a "franchisor" of the Uno-Ven franchises within the meaning of the PMPA by virtue of being an affiliate of Uno-Ven. See 15 U.S.C. § 2801(15). This is doubtful. The statute defines an affiliate as an entity that "controls, is controlled by, or is under common control with" another entity, and if *A* and *B* each own one half of *C* (Unocal and PDV each owned one-half of Uno-Ven), neither *A* nor *B* controls, let alone is controlled by or under common control with, *C*. Compare *Camina Services, Inc. v. Shell Oil Co.*, 816 F. Supp. 1533, 1537-38 (S.D. Fla. 1992). There are no cases dealing with such a situation, however, and let us therefore assume that Unocal was a co-franchisor with Uno-Ven of the Uno-Ven franchisees and that the dissolution of Uno-Ven and termination of the franchises can be considered an act of Unocal. Then the issue is whether Unocal acted reasonably and the fact that its hands were tied by its previous contract with Tosco (not alleged to have been made in bad faith) is certainly germane, as noted in another case arising from the dissolution of Uno-Ven. *PDV Midwest Refining LLC v. Armada Oil & Gas Co.*, 116 F. Supp. 2d 851, 863 and n. 17 (E.D. Mich. 2000), affirmed, 305 F.3d 498 (6th Cir. 2002); cf. *Veracka v. Shell Oil Co.*, 655 F.2d 445, 447-48 (1st Cir. 1981); *Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138, 1141-42 and n. 1 (11th Cir. 1988).

Everything considered, it is plain—too plain to create a genuine issue of material fact and so preclude the grant of summary judgment—that the termination of the franchises was reasonable within the meaning of the law. As we have pointed out, it was obviously not in Unocal's

interest to franchise the dealers, because it wanted to get out of the marketing end of the oil business and because franchising them would have broken its contract with Tosco. The plaintiffs' main argument is that in disposing of its marketing assets consequent upon the dissolution Unocal should have transferred the trademarks to PDV, which then presumably would have transferred them to the dealers. Unocal, according to the dealers, told PDV that the trademarks were not for sale. Maybe so—and the likeliest reason is that their sale to PDV might have been a breach of Unocal's contract with Tosco—but in any event there is no indication that PDV wanted them. PDV is a crude oil producer. It took the refining and marketing assets of Uno-Ven off Unocal's hands, as it were, but handed them over to its own marketing subsidiary, Citgo, see *International Oil, Chemical & Atomic Workers, Local 7-517 v. Uno-Ven Co.*, 170 F.3d 779, 780 (7th Cir. 1999), and there is no evidence that it would have wanted to market the gasoline produced by the former Uno-Ven under a competing label, namely Union 76.

Not only did PDV have no interest, so far as appears, in the Union 76 trademark; there is no indication that *any* oil company did or does have a serious interest. Bear in mind that when Uno-Ven terminated the franchises, Tosco obtained, by the terms of its contract with Unocal, the right to use the trademark anywhere in the country, including the midwest. It could have licensed the Union 76 mark to the members of the plaintiff class; it had some discussions with some of them; but in the end it issued no licenses in the midwest. Presumably it thought the license value of the mark in the region less than the cost of supporting it.

With both Unocal and Tosco in effect having abandoned the Union 76 mark in the territory served by these dealers,

another oil company could have sought a license from Tosco and could probably have obtained it cheaply, given Tosco's lack of interest in using the mark in the midwest. None did. Some of the dealers obtained licenses from oil companies selling under other marks, but none obtained a license from an oil company that wanted to license the Union 76 mark. Conceivably, another oil company could have used the Union 76 mark even without a license from Tosco, see *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364-65 (2d Cir. 1959); 2 *McCarthy on Trademarks* § 17:22, p. 17-44 (2002), though not without legal risk; subsequent use of a federally registered trademark that is still in use by the registrant elsewhere is a minefield, because registration creates a presumption that the registrant is entitled to use the registered mark throughout the nation. See 15 U.S.C. § 1057(b); *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1562 (11th Cir. 1991); 3 *McCarthy on Trademarks, supra*, § 20:17, p. 20-41; see also 2 *id.*, § 17:22, p. 17-45; 4 *id.*, § 26:32, pp. 26-51 to 26-53; *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Limited Partnership*, 34 F.3d 410, 412-13 (7th Cir. 1994); *Dawn Donut Co. v. Hart's Food Stores, Inc., supra*, 267 F.2d at 362, 365. In any event, no one took that route either.

It is reasonable as a matter of law for a business to abandon a property that has no value to it, and if the abandonment is lawful it has no duty (unless it has voluntarily assumed one) to compensate suppliers or customers who may be harmed by its decisions. That is all that happened here when Unocal withdrew from the refinery and marketing business.

A true Copy:

     Teste:

                             _____
                             *Clerk of the United States Court of*
                               *Appeals for the Seventh Circuit*