JIM MULLEN CHARITABLE FOUNDATION, Plaintiff-Appellant, v. WORLD
ABILITY FEDERATION, NFP, Defendant-Appellee.

First District (5th Division)   No. 1—07—2505

Opinion filed October 23, 2009.

David R. Bennett, Russell J. Hoover, Raymond N. Nimrod, Paul D. Margolis, and Angela M. Terry, all of Jenner & Block LLP, of Chicago, for appellant.

Richard C. Gering, of Arnstein & Lehr LLP, of Chicago, for appellee.

JUSTICE HOWSE delivered the opinion of the court:

On June 21, 2004, plaintiff Jim Mullen Foundation (JMF) filed a lawsuit against defendant World Ability Federation (WAF), alleging trademark mark infringement, trademark dilution, false designation of origin, unfair competition, interference with prospective economic advantage, trespass, and conversion. The circuit court granted summary judgment in defendant's favor on all but one of JMF's counts.

JMF appeals, contending: (1) the circuit court erred in considering defendant's *jus tertii* defense, contending defendant improperly argued the Department of Labor's alleged rights in the trademark precluded JMF from having any enforceable rights in the mark; (2) a genuine issue of material fact existed as to whether the Department of Labor had an interest in the mark; (3) a genuine issue of material fact existed as to whether JMF acquiesced to defendant's use of the mark; and (4) summary judgment was improper on counts III through V of the complaint because the claims did not rely on JMF's alleged trademark rights to establish liability. We reverse the circuit court's order and remand the cause for further proceedings.[1]

---

[1]Justice Nathaniel Howse, Jr., was appointed to the Illinois Appellate Court by the Illinois Supreme Court on August 10, 2009, replacing Justice Denise O'Malley as a member of the panel assigned to hear this case. Justice Howse is familiar with the record and briefs filed by the parties and has listened to the recording of the oral arguments held in this case on March 12, 2009.

## BACKGROUND

JMF is a nonprofit organization formed for the purpose of acquiring and delivering computers to applicants with disabilities. In February 2001, Jim Mullen, a member of JMF's board of directors, attended the announcement of President George W. Bush's "New Freedom Initiative" to help the disabled. In 2002, the JMF board decided to present a "New Freedom Awards" ceremony in Chicago to recognize people and companies that develop products for people with disabilities.

In June 2002, the United States Department of Labor (the Department) announced its solicitation of nominations in the Federal Register—a nationally distributed publication—for an awards program called the "Inaugural New Freedom Awards" (sometimes referred to as the Inaugural New Freedom Initiative Awards) to be held in Washington, D.C. The Department has presented the awards program each year in Washington, D.C., since 2002 to the time of this appeal.

In October 2002, JMF launched the "New Freedom Awards" project in Chicago with a public event that received local television and press coverage. Over the following nine months, John Chmela, JMF's director of operations, and William Smith, JMF's executive director, led the planning for the New Freedom Awards. Chmela and Smith solicited nominees, planned the ceremony, and conducted extensive fundraising—raising hundreds of thousands of dollars in donations toward the awards program. On July 22, 2003, JMF presented the inaugural New Freedom Awards at the Navy Pier Grand Ballroom. Smith and Chmela acted as the masters of ceremonies during the awards show. President Bush sent a letter congratulating JMF on its presentation of the New Freedom Awards.

In September 2003, while still holding positions at JMF, Chmela and Smith formed a new nonprofit corporation named the New Freedom Foundation (NFF), with the intention of presenting a New Freedom Awards show in 2004 without JMF's involvement. Chmela and Smith allegedly solicited cash donations on NFF's behalf for "the second annual New Freedom Awards Gala" while still employed by JMF. In his affidavit, Smith said no one from JMF ever objected to defendant's use of the "New Freedom" mark prior to the filing of JMF's complaint.

When IBM donated 10 IBM Web servers to JMF in September 2003, Smith wrote IBM a letter saying the servers should be sent to NFF for use in conducting the 2004 New Freedom Awards. Smith signed the letter as the executive director of JMF. The NFF's Web site displayed a disclaimer saying NFF and its programs were not affiliated with the Jim Mullen Charitable Foundation. NFF's planning of

the 2004 New Freedom Awards included sending out promotional material claiming it had presented the Inaugural New Freedom Awards and planned to present a "second annual" New Freedom Awards in July 2004. In an affidavit, James Mullen said JMF had not given NFF permission to use the alleged New Freedom Awards mark, solicit JMF donors, or present a second New Freedom Awards show. Mullen said JMF learned of NFF's existence around mid-November 2003 when NFF continued to occupy the downtown office space JMF had recently vacated.

After performing a search of the United States Patent and Trademark database to see if relevant registrations for "New Freedom" existed, JMF filed trademark applications in Illinois to register the "New Freedom" mark. On April 20, 2004, JMF received three certificates of registration from the Office of the Illinois Secretary of State, which registered the "New Freedom Awards" service mark in the State of Illinois for a five-year period. The certificates noted the service mark was first used on October 15, 2002, and first used in the State of Illinois on October 15, 2002. Registration number 092146 applied to the mark's use in Illinois for "entertainment & education services, namely, conducting an awards program"; number 092147 applied to the mark's use for "promoting public awareness of the need for creating products & media, establishing community programs, funding research and providing services that enhance the lives of people with disabilities"; and number 092145 applied to the mark's use for "charitable fundraising services."

JMF also filed a federal service mark application for "New Freedom Awards" with the United States Patent and Trademark Office on March 8, 2004. During the application's prosecution, the Department contacted JMF to discuss the Department's New Freedom Initiative, which included an awards ceremony in Washington, D.C. On June 15, 2005, JMF assigned all "right, title, and interest in the United States" to the New Freedom Awards trademark to the Department in exchange for an agreement "to grant JMF an exclusive license" to use the trademark for, in relevant part:

> "entertainment and education services, namely, conducting an awards program to provide recognition to individuals and companies for creating products and media and media [sic], establishing community programs, funding research, and providing services that enhance the lives of people with disabilities (Services)."

The terms of the agreement noted JMF:

> "shall have the right to use the Mark to provide the Services in Minnesota, Wisconsin, Illinois, Missouri, Indiana, Michigan, Iowa, Kentucky, and Ohio (collectively Geographic Area), U.S.A. (Rights),

unless rights to provide the Services in other geographic areas are granted in writing to the License by an authorized Licensor, and subject to the following express reservation of the continued right to use: the Licensor retains the right to exercise its rights in its NEW FREEDOM INITIATIVE AWARD trademark *** in any geographic place, but agree to refrain from granting further licenses of the Rights to *any third parties* during the term of the Agreement." (Emphasis in original.)

The agreement also noted the right to use the trademark did "not extend to any former employee/s, former board member/s, and/or former executive/s of the Licensee." Under the agreement, JMF maintained "all rights to pursue and obtain relief for such causes of action" in the lawsuit against defendant. The Department, through its agreement with JMF, expressly disclaimed any interest in the lawsuit and claimed no interest in any relief granted as a result of the suit. The Department also agreed it did not need to be a party to the lawsuit.

In April 2004, NFF submitted a federal trademark application to the United States Patent and Trademark Office in order to trademark its name. Smith was contacted by the Department of Labor. The Department expressed opposition to the application because it believed it had established a prior right to the phrase "New Freedom." In response, NFF withdrew its application and changed its name to the World Ability Foundation (WAF) on May 5, 2004. Defendant stopped referring to its planned 2004 awards show as the second annual New Freedom Awards, instead referring to the show as the New Ability Awards. In an affidavit, Smith said defendant had not used the phrase "New Freedom Awards" or "New Freedom" since 2004. Defendant held a second awards ceremony on July 30, 2004, using the name "New Ability Awards."

On June 21, 2004, plaintiff filed suit against defendant, alleging service mark infringement, trademark dilution, false designation of origin, unfair competition, interference with prospective economic advantage, trespass, and conversion. On April 4, 2007, defendant moved for summary judgment on counts I through V of plaintiff's complaint, alleging it did not infringe JMF's alleged mark because: (1) JMF did not have rights to enforce the New Freedom Awards mark; and (2) JMF, even if it did have rights, acquiesced to defendant's use of the mark or its separate awards ceremony.

Defendant alleged in its motion that JMF had not acquired enforceable rights to the phrase "New Freedom Awards" because the Department of Labor was the first to use the phrase "New Freedom" in relation to an awards show. In support of its allegation, defendant

noted the Department of Labor "advertised" the solicitation of nominees for its "New Freedom Initiative" awards show in the Federal Register—a national publication distributed in Illinois—prior to JMF's use of the phrase. Defendant alleged that since the Department's publication in the Federal Register constituted first use of the phrase in Illinois, the Department acquired the common law rights to enforce the "New Freedom" trademark against subsequent users, not JMF.

In response to the motion for summary judgment JMF alleged: it had a right to enforce the mark; defendant could not invoke the alleged rights of the Department, a third party not involved in the suit; and there was no acquiescence to defendant's use of the mark. The court entered summary judgment in defendant's favor on counts I through V of plaintiff's complaint. The court did not enter detailed findings. Count VI, which alleged trespass to land and conversion, was transferred to the law division for reassignment. The court denied JMF's motion to reconsider.

After the court found there was no just reason to delay enforcement or appeal of its ruling pursuant to Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)), plaintiff appealed.

## ANALYSIS

Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file, when taken in the light most favorable to the nonmovant, show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2006); *Intersport, Inc. v. National Collegiate Athletic Ass'n*, 381 Ill. App. 3d 312, 318, 885 N.E.2d 532 (2008). Our review of the circuit court's grant of summary judgment is *de novo. Intersport, Inc.*, 381 Ill. App. 3d at 318.

### I. Trademark Infringement

#### A. *Jus Tertii* Defense

JMF contends the circuit court erred in granting summary judgment because a genuine issue of material fact existed as to whether JMF had enforceable rights in the "New Freedom Awards" trademark. Specifically, JMF contends the circuit court erred in considering the Department of Labor's rights in the trademark, which amounted to allowing defendant to present an improper *jus tertii* defense. JMF contends the only issue properly before the circuit court was whether JMF had a superior right in the trademark to defendant, not whether the Department's right in the mark superceded JMF's right.

The principles of trademark law and the tests for infringement are rooted in the common law under both state and federal statutes.

*Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 104, 466 N.E.2d 1004 (1984). Because the statutes themselves neither create a valid trademark nor establish new rights, courts may apply a single analysis to federal, state, and common law trademark claims. *Thompson*, 126 Ill. App. 3d at 104-05. Accordingly, we may look to federal as well as state case law to resolve the issues before us. See *Thompson*, 126 Ill. App. 3d at 105.

■ To prevail on a claim of trademark infringement, the plaintiff must show: (1) it has a protectible ownership interest in the mark; and (2) the defendant's use of the mark is likely to cause consumer confusion, infringing on the plaintiff's rights to the mark. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985); *Bingham v. Inter-Track Partners*, 234 Ill. App. 3d 615, 619, 600 N.E.2d 70 (1992). Although "[s]tate registration of a trade name does not establish any substantive rights which would not otherwise exist" (emphasis omitted) (*Bingham*, 234 Ill. App. 3d at 619), state registration does constitute rebuttable *prima facie* evidence of validity (*Thompson*, 126 Ill. App. 3d at 106).

■ When more than one user claims the exclusive right to use an unregistered trademark, priority is determined by the party who first used the mark "in a genuine commercial transaction" in a particular market. *Emergency One, Inc. v. American Fire Eagle Engine Co.*, 332 F.3d 264, 267-68 (4th Cir. 2003); *Bingham*, 234 Ill. App. 3d at 619; *Thompson*, 126 Ill. App. 3d at 109. "The first user *** generally has priority to use the mark to the exclusion of any subsequent—or junior—users." *Emergency One, Inc.*, 332 F.3d at 268.

Defendant contends the Department, as first user of the trademark, had the only enforceable common law rights in the mark. JMF counters that defendant's contentions amount to a *jus tertii* defense, which several courts outside Illinois have recognized is improper in trademark infringement cases.

■ A *jus tertii* defense arises when a defendant claims a third party has rights in a trademark superior to the plaintiff's rights. *SiLite, Inc. v. Creative Bath Products, Inc.*, No. 91 C 5920 (N.D. Ill. June 29, 1993); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 909 (E.D.N.Y. 1988), citing 2 J. McCarthy, Trademarks & Unfair Competition §31:39, at 671 (2d ed. 1984). Although the appropriateness of a *jus tertii* defense in a trademark infringement action has never been directly addressed in Illinois, federal courts that have addressed the issue have consistently held "a third party's prior use of a trademark is not a defense in an infringement action." *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996); *General Cigar Company, Inc. v. G.D.M. Inc.*, 988 F. Supp. 647,

661-62 (S.D.N.Y. 1997); *Speciality Measurements, Inc. v. Measurement Systems, Inc.*, 763 F. Supp. 91, 95 (D.N.J. 1991); *Bambu Sales, Inc.*, 683 F. Supp. at 909; *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 578-79 (D.N.J. 1987).

As a matter of policy, several courts have recognized:

> " '*jus tertii* should not be allowed as a defense in any trademark case. So long as plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world. The plaintiff's speculative dispute with a third party does not concern the defendant.' " *Bambu Sales, Inc.*, 683 F. Supp. at 909, quoting 2 J. McCarthy, Trademarks & Unfair Competition §31:39, at 675 (2d ed. 1984).

In *Yost*, a nonprofit environmental organization brought a trademark infringement action under the Lanham Act against the defendants who adopted the organization's name after the organization inadvertently forfeited its corporate status. The trial court enjoined the defendants from using the name. On appeal, the defendants contended the plaintiff never established it was the first user of the name "Committee for Idaho's High Desert," pointing to trial testimony that established the name was used by a third party three years before the plaintiff incorporated.

The court held lack of evidence as to the plaintiff's acquisition of trademark rights from the first user was irrelevant. *Yost*, 92 F.3d at 820. The court noted that as a practical matter, the plaintiff appeared to be the direct and immediate successor of any individuals who had used the name before the plaintiff, based on the prior user's abandonment of the mark and the plaintiff's exclusive use of the mark for a long period. *Yost*, 92 F.3d at 820. Although the third party in *Yost* had clearly abandoned use of the mark prior to the plaintiff's continued exclusive use of the mark, the court went on to find that "[m]ost importantly, however, a third party's prior use of a trademark is not a defense in an infringement action." *Yost*, 92 F.3d at 820. The court reasoned:

> "In accordance with this rule, the question of whether some individuals used the name 'Committee for Idaho's High Desert' prior to [the plaintiff] is no defense for appellants given [the plaintiff's] continuous and exclusive use of the name for at least 12 years before [the defendants'] use." *Yost*, 92 F.3d at 821.

In *SiLite, Inc.*, the plaintiff, an Illinois corporation, brought suit against the defendant, alleging the defendant's line of acrylic plastic housewares infringed the plaintiff's "REFLECTIONS" trademark for similar products. In its answer to the plaintiff's complaint, the

defendant raised six affirmative defenses. The plaintiff moved to strike the third affirmative defense on the grounds that it raised an invalid *jus tertii* defense. Although the defendant recognized *jus tertii* is commonly viewed as an invalid defense in infringement actions, it claimed the affirmative defense preserved its right to dispute the marks secondary meaning because the defense alleged the plaintiff did not have the exclusive right to use the mark. *SiLite*, slip op. at 2. The district court rejected the defendant's contention, finding the third affirmative defense raised a *jus tertii* defense:

> "Specifically, the defense states that Scott Paper Corp. of Pennsylvania owns the registered trademark 'REFLECTIONS' for bath accessories and that plaintiff does not have an exclusive right to use the 'REFLECTIONS' mark [citation]. This language explicitly raises the *jus tertii* defense, and is appropriately stricken." *SiLite, Inc.*, slip op. at 2.

In *Speciality Measurements, Inc.*, the plaintiff moved for a preliminary injunction and summary judgment on its trademark infringement claims to prevent the defendant from using the initials MSI, alleging the initials violated the plaintiff's trademark in its initials—SMI. In response to the plaintiff's summary judgment motion, the defendant asserted before the district court that several other companies throughout the nation utilize, and have registered, the mark SMI or MSI. The defendant asserted that because the plaintiff could not establish a prior superior right to the SMI trademark, it could not claim a protectable interest in the mark. The district court found: "this argument is merely an attempt by defendant to raise a *jus tertii* defense. *Jus tertii*, or raising the rights of third parties, should not be allowed as a defense in any trademark case." *Speciality Measurements, Inc.*, 763 F. Supp. at 95.

Here, similar to *Yost*, *SiLite, Inc.*, and *Speciality Measurements, Inc.*, defendant contends plaintiff is unable to pursue an infringement action because the Department of Labor, a third party not involved in the lawsuit, has the exclusive common law right to the "New Freedom" mark through first use of the mark in Illinois. Specifically, defendant alleged in its summary judgment motion:

> "The short answer to Plaintiff's claims is thus that Plaintiff has no right to enforce. Its use of the words 'New Freedom' in the context of increasing the independence of people with disabilities came years after (and was consciously based upon) the Bush Administration's 'New Freedom Initiative,' and its use of 'New Freedom Awards' to honor efforts designed to increase the independence of people with disabilities came after the Department of Labor's use of exactly the same phrase in substantially the same context, with

the result that any common law trademark rights associated with those words belonged to the Department of Labor, not to JMF."

However, we note the Department, through its license agreement with JMF to use the "New Freedom" mark, expressly disclaimed any interest in the lawsuit and claimed no interest in any relief granted as a result of the suit.

Although defendant attempts to recharacterize its defense by suggesting plaintiff simply has no common law right to enforce the mark in light of the Department's rights, we find defendant's allegations amount to a claim that a third party not involved in the lawsuit has rights in a trademark superior to plaintiff's alleged rights. That is the very essence of a *jus tertii* defense. JMF is only required to establish it had some right in the "New Freedom" mark superior to defendant's right, not a right to use the mark superior to the whole world. See *Bambu Sales, Inc.*, 683 F. Supp. at 909, quoting 2 J. McCarthy, Trademarks & Unfair Competition §31:39, at 675 (2d ed. 1984) (" 'Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world' ").

As to whether JMF has *any* common law right to use the mark, we note the Department's subsequent decision to assume any "right, title, and interest in the United States" JMF may have had in the mark in exchange for an agreement "to grant JMF an exclusive license" to use the trademark in Illinois, mixed with the fact that JMF properly registered the mark with the Secretary of State in Illinois, strongly suggests an unresolved question of fact remains as to whether JMF had an enforceable right to use the mark in Illinois.

Because a *jus tertii* defense is improper in a trademark infringement action, we find summary judgment should not have been entered on JMF's trademark claims based on any allegedly exclusive or superior third-party rights the Department may have had in the mark. See *Yost*, 92 F.3d at 821; *Speciality Measurements, Inc.*, 763 F. Supp. at 95; *Bambu Sales, Inc.*, 683 F. Supp. at 909.

## B. Territorial Scope of the Mark

Even if we were to find defendant's contention did not raise an invalid *jus tertii* defense, we find the issue of whether the Department of Labor's territorial use of the mark extended beyond the Washington, D.C., area to Illinois presented an issue of material fact improper for summary judgment.

Defendant contends the Department's use of the "New Freedom Awards" mark was national in scope, not merely local to the Washington, D.C., area, preventing JMF's enforcement of the mark in

Illinois. In support, defendant notes the Department of Labor "advertised" the solicitation of nominees for its "New Freedom Initiative" awards show in the Federal Register—a national publication distributed in Illinois—prior to JMF's use of the phrase in Illinois. Defendant contends the Department's publication of the notice was sufficient as a matter of law to constitute first use of the phrase in Illinois. We disagree.

■ The amount of activity constituting "use" depends on the facts of a given case. *S Industries, Inc. v. Stone Age Equipment, Inc.*, 12 F. Supp. 2d 796, 805 (N.D. Ill. 1998). "The guiding principle is that the activity be 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.' " *S Industries, Inc.*, 12 F. Supp. 2d at 805, quoting *Blue Bell, Inc. v. Farah Manufacturing Co.*, 508 F.2d 1260, 1266 (5th Cir. 1975).

The territorial extent of ownership rights in an unregistered mark is not unlimited, however. *Grupo Gigante SA de CV v. Dallo & Co.*, 391 F.3d 1088, 1093 (9th Cir. 2004); *Emergency One, Inc.*, 332 F.3d at 268. At common law, the exclusive right to use a mark is " 'limited to areas where [the mark] had been used and the claimant of the mark had carried on business.' " *Emergency One, Inc.*, 332 F.3d at 268, quoting *Armand's Subway, Inc. v. Doctor's Associates, Inc.*, 604 F.2d 849, 849 (4th Cir. 1979). Although federal registration of a mark creates a "presumption of priority" in the registrant of the mark that is "nationwide in effect," a user claiming common law ownership of a mark does not enjoy such a presumption and must "establish his right to exclusive use" by showing actual use in a given territory. *Emergency One, Inc.*, 332 F.3d at 268-69.

■ Although earlier authorities held a user of a mark was only protected in the area in which it did business, more recent decisions have recognized the role of mass media in enlarging commercial markets—using three concepts to define what constitutes a protected zone. *Brewer v. Egyptian Sports, Inc.*, 122 Ill. App. 3d 1022, 1027, 462 N.E.2d 520 (1984). The first consideration is the prior user's actual market; second is the reach of the user's advertising and reputation; and third is the area to which the user can reasonably be expected to expand its trade. *Brewer*, 122 Ill. App. 3d at 1027, citing *Wiener King, Inc. v. Wiener King Corp.*, 407 F. Supp. 1274 (D.N.J. 1976).

In *Brewer*, Mt. Vernon restaurant owners filed a complaint for injunctive relief against a competitor, alleging the competitor's use of a similar name for its restaurant in Carbondale infringed the plaintiffs' trademark rights. Soon after the plaintiffs opened their "Prime Time, Restaurant * Lounge" in Mt. Vernon in June 1980, they began placing

ads on WSIL-TV, a television station that reached Carbondale. The plaintiffs also advertised the restaurant in the *Southern Illinoisan*, a newspaper published in Carbondale. The plaintiffs discontinued the television and newspaper advertisements shortly after. In November 1982, the defendant opened the "Prime Time, Restaurant and Lounge" in Carbondale, 60 miles away from Mt. Vernon. The plaintiffs filed their complaint for injunctive relief shortly after the defendant began advertising the restaurant.

The appellate court held the zone of protection for prior use of the mark consisted of the "territory into which the plaintiffs have sought to solicit business, or into which knowledge of the restaurant has spread, with or without assistance from the plaintiffs." *Brewer*, 122 Ill. App. 3d at 1027. The court recognized, however, that "[t]here must certainly be a requirement of significance to that reputation or the penetrating of the advertising." *Brewer*, 122 Ill. App. 3d at 1027-28. The court noted simply advertising the plaintiffs' restaurant in the city where the defendant's restaurant was eventually built would not extend the protection, "absent a showing that advertising was reflected in some public awareness and patronage of the restaurant by its residents." *Brewer*, 122 Ill. App. 3d at 1028. Finding the city of Carbondale fell within the advertising and reputation zone of the plaintiffs' restaurant, the court extended the zone of protection for plaintiffs' prior use of the mark to the Carbondale market. *Brewer*, 122 Ill. App. 3d at 1028. In support of its findings, the court noted the plaintiffs had advertised in the Carbondale media market. The court also noted several witnesses at trial indicated the plaintiffs' restaurant was known in Carbondale.

While we recognize here that the Department's notice in the Federal Register undoubtably reached some Illinois residents, we question whether the Department's activity was " 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.' " *S Industries, Inc.*, 12 F. Supp. 2d at 805, quoting *Blue Bell, Inc.*, 508 F.2d at 1266.

Unlike *Brewer*, the Department's notice was not broadcast through traditional mass-media means intended to reach the Illinois general public. No evidence was presented to indicate people in Illinois were aware of the Department's award program, excluding the Federal Register publication itself. In fact, during oral argument on the summary judgment motion defense counsel admitted neither defendant nor JMF was even aware of the Department's Washington, D.C.-based awards program prior to JMF's use of the mark in October 2002. By contrast, the record reflects JMF conducted significant local media advertising to announce the launch of its inaugural "New Freedom Awards" project in the Chicago area.

■ More importantly, we note courts have generally recognized "the territorial scope of trademark rights has been a question of fact." *Peaches Entertainment Corp. v. Entertainment Repertoire Associates, Inc.*, 62 F.3d 690, 693 (5th Cir. 1995), citing *Federal Glass Co. v. Loshin*, 224 F.2d 100, 101-02 (2d Cir. 1955). Given the record before us, we find the issue of whether the Department's publication of notice in the Federal Register was "sufficiently public" to extend territorial protection of the mark from Washington, D.C., to Illinois constitutes an unresolved question of material fact, rendering summary judgment on that basis inappropriate.

## C. Acquiescence

■ Notwithstanding any rights JMF may have had in the mark, defendant contends summary judgment is appropriate given the fact that JMF clearly acquiesced to defendant's use of the mark by submitting the costs JMF incurred hosting the inaugural "New Freedom Awards" to defendant for payment.

Although it is unclear from the record as to whether the circuit court considered the acquiescence prior to granting summary judgment, we "may affirm a grant of summary judgment on any basis appearing in the record, regardless of whether the lower courts relied upon that ground." *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315, 821 N.E.2d 269 (2004).

When a person entitled to exclusive use of a trademark commits unreasonable delay in asserting its rights against an infringer or acquiesces in the infringer's use, a court of equity has the discretionary power to deny injunctive relief, accounting, or damages. *Profitness Physical Therapy Center v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 703 (2d Cir. 1970). The elements of acquiescence are:

> " '(1) the senior user actively represented that it would not assert a right or a claim: (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice.' " *Profitness Physical Therapy Center*, 314 F.3d at 67, quoting *Times Mirror Magazines, Co. v. Field & Stream Licenses, Inc.*, 294 F.3d 383, 395 (2d Cir. 2002).

A plaintiff communicates active consent through conduct amounting to "an explicit or implicit assurance that plaintiff, with knowledge of defendant's conduct, will not assert its trademark rights." *Profitness Physical Therapy Center*, 314 F.3d at 68.

Here, the record reflects JMF's attorney, Angelo Loumbas, took part in a series of discussions with William Smith of the New Freedom

Foundation as part of the process of separating the two organizations in early 2004. Following the discussions, JMF forwarded invoices and other unpaid bills from the 2003 New Freedom Awards event held at Navy Pier to the defendant for payment. In his affidavit, Smith said defendant and JMF understood the bills for the prior event had to be paid before another New Freedom Awards show could be held at Navy Pier. Defendant paid over $28,000 in costs incurred for the 2003 awards show. Defendant contends payment of the bill for the prior awards show on JMF's behalf indicated JMF acquiesced to defendant using the mark to hold the awards show in 2004.

JMF points to an e-mail sent from Smith to Loumbas in May 2004, however, as evidence indicating defendant knew JMF continued to object to defendant's presentation of a 2004 New Freedom Awards show, despite defendant's payment of the prior award show's unpaid bills. The e-mail from Smith made clear defendant was "still getting feedback from our supporters, sponsors and vendors who report getting telephone calls or letters from Jim or JMF attempting to dissuade their support of our organization." The e-mail notes defendant "always felt avoiding litigation was in both firms' best interest, but perhaps we are past that point at this juncture." JMF admits, however, that it has made no attempt to hold another New Freedom Awards show in Chicago since 2003.

After reviewing the record, we cannot say JMF's conduct in allowing defendant to pay the $28,000 in unpaid bills indicated as a matter of law that JMF actively consented to defendant's use of the mark. JMF's apparent decision to allow defendant to pay the outstanding 2003 award show bills, mixed with the fact that JMF still actively discouraged defendant's supporters from donating and filed state and federal trademark applications in an apparent attempt to protect the mark, indicates unresolved questions of material fact remain as to whether JMF intended to acquiesce to defendant's use of the mark.

## II. Other Claims

JMF contends the circuit court erred in granting summary judgment on counts III through V of its complaint. We agree.

■ Count III of JMF's complaint alleged false designation of origin and false description. Section 2 of the Uniform Deceptive Trade Practices Act (815 ILCS 510/2 (West 2004)) provides:

"[a] person engages in deceptive trade practice when in the course of his or her business, vocation, or occupation, the person:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services."

■ Count V alleged tortious interference with prospective economic advantage, which requires a plaintiff establish:

> " '(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.' " *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01, 751 N.E.2d 1126 (2001), quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07, 667 N.E.2d 1296 (1996).

As JMF properly notes, neither claim explicitly required JMF to establish it had a valid right to enforce the "New Freedom" trademark prior to establishing liability.

Count IV alleged unfair competition. Although the same set of facts and circumstances may be used to support both a claim of trademark infringement and unfair competition, we note "[u]nfair competition is a broader concept than trademark infringement and depends upon likelihood of confusion as to the source of plaintiff's goods when the whole product, rather than just the service mark, is considered." *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 113, 466 N.E.2d 1004 (1984).

■ While we recognize JMF specifically alleged facts related to defendant's improper use of the "New Freedom" mark to support its noninfringement-based counts III through V, we note none of the remaining counts explicitly required JMF to prove it had a valid common law right to the mark in order to establish liability. The circuit court apparently granted summary judgment on counts III through V of the complaint based solely on the Department's exclusive right to enforce the "New Freedom" mark—a conclusion we find inappropriate given the nature and elements of proof necessary to establish liability with regards to the remaining counts.

Moreover, we have already determined summary judgment on the trademark-infringement-based counts in JMF's complaint was improper. Because no other grounds were advanced to support summary judgment on counts III through V on appeal, we also reverse summary judgment on those counts and remand the cause for further proceedings.

## CONCLUSION

We reverse the circuit court's summary judgment order and remand the cause for proceedings consistent with our opinion.

Reversed and remanded.

CAHILL, P.J., and McBRIDE, J., concur.